IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ESTATE OF JACQUELINE ABRAMS :     No. 3:23cv307
BY REYNALDO MARCANO, :
ADMINISTRATOR, :     (Judge Munley)
          Plaintiff, :
          :
          :
    v.           :
          :
          :
CRESTBROOK INSURANCE : 
COMPANY, :
          Defendant :

## MEMORANDUM

Plaintiff Reynaldo Marcano, as Administrator of the Estate of Jacqueline Abrams, brings this insurance coverage dispute against Defendant Crestbrook Insurance Company ("Crestbrook") arising from the denial of a claim under Jacqueline Abrams's ("Decedent") homeowner's insurance policy. For context, Decedent was Marcano's spouse. Plaintiff advances claims for breach of contract and bad faith.

Following discovery, Crestbrook now moves for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure on both claims. (Doc. 33). For the reasons set forth below, the motion will be granted in part and denied in part.

## Background

This insurance coverage dispute stems from extensive water damage discovered at plaintiff's property located at 207 Park St., Honesdale, PA 18431

("PA Property"). At the center of the dispute are competing factual and legal questions concerning when the damage occurred, whether the property qualified as a covered "residence premises" under the homeowner policy ("Policy"), and whether the claimed loss resulted from a sudden pipe burst or long-term seepage or leakage. Marcano contends that Crestbrook wrongfully denied coverage and acted in bad faith, while defendant maintains that coverage is barred under the terms and conditions of the Policy.

On or about June 10, 2022, a representative of Decedent discovered extensive water damage throughout the insured property.[1] (Doc. 33-3, SOF ¶ 4). The parties agree that the Policy was in effect on the date when the water damage occurred. (Id. ¶ 5). The Policy identified the PA Property as a "residence premises." [2] (Id.) Following discovery of the water damage, Marcano submitted a claim for coverage to Crestbrook under the Policy.

Apparently, the water damage was caused by a burst pipe or valve servicing the second-floor bathroom shower. (Id. ¶ 6). Defendant contends that

---

[1] Unless noted otherwise, the court cites to the defendant's statement of material facts ("SOF"), (Doc. 33-3), for facts which the plaintiff admitted in his responses to the SOF, (see Doc. 37, "RSOF"). All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015) (citation omitted).

[2] Crestbrook insured the PA Property under the Policy from June 24, 2020, through June 24, 2021. (Doc. 33-4, Ex. D, Policy, DEF 1461- 1517). According to the renewal policy declaration, the Policy was renewed for the period June 24, 2021 through June 24, 2022. (Id., Ex. C, Policy, DEF 1-55).

neither plaintiff nor Decedent resided at the Property in 2021 when the damage occurred. (Id. ¶ 7). Marcano testified that, beginning in December 2019 and continuing until Decedent's death, Decedent lived exclusively in Florida ("FL Property") and never resided at the PA Property.[3] (Doc. 33-4, Ex. E, Marcano Dep. at 107:15-108:12). Marcano, however, maintains that he and the Decedent resided at the FL Property during the winter months and at the PA Property during the summers. (Doc. 37, RSOF ¶ 7). According to plaintiff, both locations were listed as insured's residences under the Policy. (Id.) Marcano further asserts that, because of her age, weather conditions, and Covid-19 restrictions, Decedent was unable to travel to the PA Property during the summers of 2020 and 2021.[4] (Id.)

The record reflects unusually high water usage at the PA Property during the relevant time period. Between January 25, 2021, and February 23, 2021, 140,000 gallons of water were used at the PA Property. (Doc. 33-3, SOF ¶ 8). Between February 23, 2021, and March 23, 2021, approximately 152,700 gallons of water were used. (Id. ¶ 9). According to plaintiff, the flooding continued after

---

[3] The FL Property is located at 270 Palmetto Ln, West Palm Beach, FL 33405.

[4] According to the complaint, the Decedent passed away on April 11, 2022. (Doc. 1, Compl. ¶ 1). That detail is not disputed by the defendant.

3

February 23, 2021 and persisted into March and even April 2021. (Doc. 37, RSOF ¶ 7).

Plaintiff testified that he had no explanation for that level of water usage other than a burst pipe. (Doc. 33-3, SOF ¶ 10). Marcano further testified that he first became aware in June or July of 2022 that a pipe had burst in or around late January 2021, causing water to leak throughout the PA Property. (Id. ¶ 11).

Defendant's expert, Stuart Morrison, P.E., concluded, based on the water meter readings, that water had been flowing for approximately twenty-five days before February 23, 2021, and that the loss could not have occurred only two days before the meter reading. (Doc. 33-3, SOF ¶ 12). Plaintiff similarly testified that the Aqua water bill demonstrated that the pipe burst before February 23, 2021. (Doc. 33-4, Ex. E, Marcano Dep. at 79:3-20).

The PA Property had last been winterized in 2019. (Doc. 33-3, SOF ¶ 14). The pipes were not drained because, according to plaintiff, the boiler heating system remained on and the thermostat was set at 70 degrees. (Doc. 37, RSOF ¶ 14). Marcano asserts that the pipes could not have been fully drained because the boiler system required circulating hot water to remain operational. (Id.)

At this stage, the parties agree that the 140,000 gallons of water usage recorded in February indicated that the water problem began before February 23, 2021. (Doc. 33-3, SOF ¶ 16). Plaintiff nevertheless emphasizes that the flooding

4

did not stop in February and instead continued into April 2021. (Doc. 37, RSOF ¶ 16).

On July 19, 2022, Crestbrook retained Gallinger Environmental Management Corp. ("GEM") to inspect the PA Property. (Doc. 33-3, SOF ¶ 21). GEM concluded that: (1) significant visible mold growth and water damage were present throughout the house; (2) the water damage was extensive and not recent; and (3) the water intrusion was caused primarily by plumbing leaks originating from the second-floor bathroom area, which caused water to flow downward, collapsing the television room ceiling and flooding the basement. (Id.)

Notably, the parties dispute the nature of the water loss. Crestbrook characterizes the loss as resulting from the "seepage or leakage of water," whereas, Marcano describes it as a "deluge from burst pipes," which plaintiff contends is materially different from seepage or leakage. (Id. ¶ 23; Doc. 37, RSOF ¶ 23).

Based on the record, it appears that Marcano filed a claim for property damage sometime in June 2022. (Doc. 33-4, Ex. N, Dec. Letter at DEF 315). Thereafter, Crestbrook issued a reservation of rights letter dated June 14, 2022. (Doc. 33-3, SOF ¶ 25). The letter identified potential coverage issues, specifically that Crestbrook was not waiving any policy conditions or exclusions and that it reserved its rights to deny coverage under the terms of the Policy. (Id.)

The letter also referenced the Policy provision requiring any legal action to be brought within two years of the date of loss or damage. (Id.)

Crestbrook formally denied the claim in a letter dated December 2, 2022, sent to Marcano. (Id. ¶ 28). The denial letter asserted that the PA Property did not qualify as the Decedent's "residence premises," citing applicable Policy exclusions; and again it referenced the Policy provision requiring suit to be filed within two years of the date of loss or damages. (Id.) The letter further stated that Crestbrook's review of the water usage records raised concerns regarding the timing of the alleged loss. (Id. ¶ 30).

Marcano initiated this action on February 21, 2023. Plaintiff contends that defendant's refusal to indemnify the claimed losses constitutes a breach of contract and further alleges that defendant acted in bad faith in denying coverage. (Doc. 1, Compl. ¶¶ 16, 24, 25).

**Jurisdiction**

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332. As alleged, there is complete diversity of citizenship between the parties and the amount in controversy exceeds the jurisdictional limit. (Doc. 1, Compl. ¶ 3). The Decedent's estate was probated in Pennsylvania. (Id. ¶ 1). Crestbrook is a casualty insurance company based in Arizona. (Id. ¶ 2). See 28 U.S.C. § 1332 ("district courts shall have original jurisdiction of all civil actions where the matter

in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different states[.]").

As a federal court sitting in diversity, the court applies state substantive law. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)). Pennsylvania law applies in this case.

**Legal Standard**

Summary judgment is proper when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also FED. R. CIV. P. 56(a). "A fact is material if its resolution 'might affect the outcome of the suit under the governing law,'...[a]nd a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

At this stage, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. All "facts in dispute," Daniels, 776 F.3d at 187, and all "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the [opposing] party[,]" Matsushita Elec.

7

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up).

"[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners, 676 F.2d 81, 84 (3d Cir. 1982).  Furthermore, "a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted).  "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Id. (citations omitted).

A motion for summary judgment may also be granted where a moving party demonstrates that the nonmoving party "has not made 'a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial.' " Mall Chevrolet, Inc., 99 F.4th at 630 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 332 (1986) (emphasis removed)).  After a moving party carries their burden to show the absence of a genuine, material factual dispute, Rule 56 flips the burden onto "the nonmovant to 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " Daubert v. NRA Grp., LLC, 861

F.3d 382, 391 (3d Cir. 2017) (quoting <u>Celotex Corp.</u>, 477 U.S. at 324). The non-moving party must "do more than 'simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587).

If a party fails to properly address another party's assertion of fact as required by Rule 56, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it [.]" FED. R. CIV. P. 56(e)(3). Summary judgment is appropriate where the moving party is entitled to judgment as a matter of law. <u>Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.</u>, 922 F.2d 168, 175 (3d Cir. 1990).

## Analysis

Crestbrook contends that plaintiff's breach of contract and bad faith claims fail as a matter of law. The court will address each claim in turn.

### 1. Breach of Contract

Under Pennsylvania law, a plaintiff asserting a breach of contract claim must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract [,] and (3) resultant damages." <u>Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.</u>, 137 A.3d 1247, 1258 (Pa. 2016).

To evaluate Marcano's breach of contract claim, the court must determine the scope of coverage afforded under the Policy. Under Pennsylvania law, insurance policies are interpreted according to ordinary principles of contract interpretation because "at base, an insurance policy is nothing more than a contract between an insurer and an insured." Gallagher v. GEICO Indem. Co., 201 A.3d 131, 137 (Pa. 2019) (citation omitted). If the policy language is clear and unambiguous, courts must give effect to that language according to its plain and ordinary meaning, unless doing so would violate a clearly established public policy. Kurach v. Truck Ins. Exch., 235 A.3d 1106, 1116 (Pa. 2020) (citation omitted). Where policy terms are ambiguous, or "subject to more than one reasonable interpretation when applied to a particular set of facts[,]" the provision must be construed "in favor of the policyholder and against the insurer, as the insurer drafted the policy and selected the language which was used therein." Id. (citations omitted and quotation marks removed). With these principles in mind, the court will later examine the Policy provisions relevant to the coverage dispute.

Crestbrook advances three theories in support of dismissal of the plaintiff's breach of contract claim. First, defendant contends that Marcano failed to commence this action within two years of the date of loss or damage, as required

by the Policy.  Second, Crestbrook asserts that the PA Property did not qualify as the "residence premises" and therefore was not covered under the Policy.  Third, defendant argues that plaintiff's claim is barred by the Policy's exclusion for continuous seepage or leakage from a plumbing system.  These arguments are unconvincing.

### a. Statute of Limitations

Crestbrook contends that Marcano's breach of contract claim is barred by the two-year suit limitations provision contained in the Policy.  Specifically, Crestbrook points to water usage records showing that 140,000 gallons of water were used in February 2021 and to an expert opinion concluding that a plumbing leak occurred in February and March of 2021. (Doc. 33 ¶ 24).

Under Pennsylvania law, breach of contract claims are generally subject to a four-year statute of limitations. See 42 PA. CONS. STAT. § 5525(a).  The insurance contract at issue here, however, contains a shorter contractual limitations period.  Specifically, the Policy provides: "8. **Suit Against Us**: "No action can be brought against us unless there has been full compliance with the policy provisions. Any action must be started within two years after the date of loss or damage." (Doc. 33-4, Ex. D, Policy at DEF 1507).

Pennsylvania law permits contracting parties to shorten the applicable limitations period so long as the shortened period "is not manifestly

11

unreasonable." Palmisano v. State Farm Fire & Cas. Co., No. CIV.A. 12-886, 2012 WL 3595276, at *9 (W.D. Pa. Aug. 20, 2012) (quoting 42 PA. CONS. STAT. § 5501).  Notably, "[t]his Commonwealth has long recognized the validity of a policy provision limiting the time of bringing suit under its terms and rendering the normal statute of limitations for the cause of action in question inapplicable." Commonwealth v. Transamerican Ins., 341 A.2d 74, 76 (Pa. 1975).  In this regard, Pennsylvania courts as well as federal courts applying Pennsylvania law, have routinely upheld contractual limitations periods as short as one year as reasonable. Id. at *9 (collecting decisions). See, e.g., Gen. State Auth. v. Planet Ins. Co., 346 A.2d 265, 267 (Pa. 1975) ("The law is clear that such a clause, setting time limits upon the commencement of suits to recovery on a policy, is valid and will be sustained"); Reinhart v. Erie Ins. Co., No. 2034 MDA 2014, 2015 WL 6159391, at *6 (Pa. Super. Ct. Apr. 30, 2015) ("The validity of the one-year limitation of suit provision in fire insurance policies has been consistently upheld by Pennsylvania Courts"); Pratts v. State Farm Fire & Cas. Co., No. 3:16-CV-2385, 2019 WL 1952875, at *5 (M.D. Pa. May 2, 2019) ("Such contractual provisions shortening the period for an insured to file a claim are permissible under Pennsylvania law.").

Marcano does not dispute the enforceability of the Policy's limitations provision. (See Doc. 38, Br. in Opp. at 5-8).  Instead, plaintiff argues that this

12

action was commenced within the two-year contractual limitations period because the loss or damage continued into April 2021. (Id.)  Plaintiff also contends that Crestbrook waived reliance on the limitations provision. (Id. at 12-20).

Plaintiff commenced this action on February 21, 2023, by filing a complaint in this court. (Doc. 1).  According to plaintiff, Crestbrook's own investigation and expert report indicated that the water flooding continued through at least April 2021. (Id.)

In its December 2022 denial letter, Crestbrook stated that "[w]ater usage statements showed 140,000 gallons used in February of 2021, 152,700 gallons in March of 2021, and 36,900 gallons in April of 2021. This resulted in further concerns regarding the timing of the reported loss." (Doc. 33-4, Ex. N, Dec. Letter at DEF 315).  The letter further stated that "Crestbrook's investigation, including review of water bills and the findings of independent experts, revealed that a plumbing leak occurred in February, March, and April of 2021." (Id. at DEF 318).

Similarly, defendant's expert, Stuart Morrison, P.E., noted in his report:

> The records indicate a normal usage at the property of 200-300 gallons per month from January 28, 2020, up through January 25, 2021. The following meter reading on February 23, 2021, showed a usage of 140,000 gallons. The following months reading on March 23, 2021 had a total usage of 152,700 gallons, for the 28 days from

13

February 25th until March 25th. The following month showed usage of 35,900 gallons, until the water service was shut off for non-payment on April 19, 2021.

(Doc. 33-4, Ex. H., Morrison Report at 5).

Based on this evidence, a genuine dispute of material fact exists regarding the timing and duration of the loss.  Specifically, the record does not permit a precise determination as to when the loss or damage began.  Nor does it resolve whether the loss or damage continued through March or April 2021.

Crestbrook relies on Pratts v. State Farm Fire & Cas. Co., No. 3:16-CV-2385, 2019 WL 1952875, at *6 (M.D. Pa. May 2, 2019), in support of its position. In Pratts, the plaintiff argued that the limitations period began to run only when her realtor discovered the water damage at the property. Id.  The court rejected that argument, explaining that "the Pennsylvania Supreme Court has rejected that proposition on at least two occasions." Id.  (citing Lardas v. Underwriters Ins. Co., 231 A.2d 740 (Pa. 1967) and Gen. State Auth., 346 A.2d at 265)).  The court concluded that the "date of loss" is an objective fact and does not depend upon when the insured became aware of the damage. Id.

Unlike the plaintiff in Pratts, Marcano does not invoke the discovery rule or argue that the limitations period began when he discovered the damage.[5]

---

[5] In Pratts, the evidence permitted the court to identify the latest possible date of loss with relative precision.  There, the property's water bill reflected no water usage between December

Rather, plaintiff contends that the date of loss or damage itself extended into April 2021 because the water intrusion and resulting damage continued until that time. Thus, while Pratts is instructive, it is not dispositive of the issue presently before the court.

Viewing the evidence in the light most favorable to Marcano, a reasonable jury could conclude that the loss or damage continued through April 2021. If so, then plaintiff's February 2023 complaint would fall within the Policy's two-year contractual limitations period.[6] Accordingly, defendant is not entitled to summary judgment on Marcano's breach of contract claim on this basis alone.

---

9, 2014 and January 7, 2015, but showed 134,700 gallons used during the next billing cycle, resulting in a charge of $ 1,479.78. 2019 WL 1952875, at *3. Moreover, the water company notified the plaintiff by letter dated January 27, 2015 that water service to the property had been shut off. Id. at *6. Based on that evidence, the court had reason to conclude that the loss occurred well before March 14, 2015, notwithstanding the plaintiff's contention that March 14, 2015 was the date of loss. See id.

Crestbrook further relies on Condi v. State Farm Ins. Co., No. 3:13CV1100, 2013 WL 4520852, at *5 (M.D. Pa. Aug. 26, 2013), to support its position. In Condi, the date of loss was readily ascertainable because the plaintiffs' property sustained damage during a severe storm on September 7, 2011. Id.

This case presents a different factual scenario. Unlike Pratts, the record does not establish with any degree of certainty when the water intrusion began or if the resulting damage ceased in February 2021. And unlike Condi, the alleged loss was not tied to a single storm or other discrete event occurring on a known date. Accordingly, the court cannot determine when the loss or damage occurred here.

[6] Marcano also argues that Crestbrook waived reliance on the Policy's contractual limitations provision. Specifically, Marcano contends that Crestbrook repeatedly represented in correspondence that the date of loss was June 10, 2022. (Doc. 38, Br. in Opp. at 6). Because the court concludes that genuine disputes of material fact exist regarding both the timing and duration of the loss, disputes that bear directly on the timeliness of the complaint, it need not

15

### b. Residence Premises

Crestbrook also contends that there is no coverage for the loss alleged in the complaint because the PA Property was not the "residence premises" under the Policy. (Doc. 33, ¶ 30).  Specifically, defendant maintains that, at the time of the loss and damage occurred, neither the named insured, i.e., Decedent, nor Marcano resided at the PA Property. (Doc. 33-1, Br. in Supp. at 10-11).

Marcano testified that no one had physically lived at the PA Property since December 2019, more than two-and-a-half years before plaintiff discovered the water damage. (Id.)   It is likewise undisputed that no one continuously occupied the PA Property during the Policy period when the loss or damage allegedly occurred in January or February 2021.[7] (Id.)

---

address plaintiff's alternative argument that Crestbrook waived the Policy's two-year contractual limitations period.

[7] Plaintiff alleges in the complaint that Crestbrook denied the claim based on a "lack of residence, and/or that fraud in the application occurred." (Doc. 1, Compl. ¶ 19).  Crestbrook, however, maintains that there is no evidence that the claim was denied because of fraud in the insurance application. (Doc. 33-1, Br. in Supp. at 15).  In its reply brief, Crestbrook further asserts that the claim was not denied solely based on alleged material misrepresentations, but rather for several reasons discussed throughout the briefing. (Doc. 39, Reply Br. at 12). According to Crestbrook, there is no genuine dispute that it had a reasonable basis to conclude that plaintiff made material misrepresentations during the claim investigation. (Doc. 39, Reply Br. at 12).

The record suggests that Marcano's statements during two recorded interviews contradicted his later sworn testimony regarding the last time he was present at the PA Property and whether he winterized that same property. (Doc. 33-4, Ex. N, Denial Letter at DEF 315-16).

The parties did not meaningfully develop the misrepresentation issue in their submissions. In any event, the court need not address that issue here because it is not central to the matters presently before the court.

16

The Policy provides, *inter alia* as follows:

**COVERAGE A—DWELLING**

1. **We** cover:

a.  The dwelling on the **residence premises** used mainly as **your** private

residence including attached structures.

(Doc. 33-4, Exhibit D, Policy at DEF1493) (bold type in original).

According to the Policy:

> 1. **You** and **Your** refer to:
>    a. The named **insured** shown in the Declarations; and
>    b. The spouse of the named **insured** if a resident of the same household. If the spouse ceases to be a resident of the same household during the policy period or prior to the inception of this policy, the spouse will be considered **you** and **your** under this policy, but only until the earlier of:
>
>       (1) The end of 90 days following the spouse's change of residency;
>       (2) The effective date of another policy listing the individual as a named **insured**; or
>       (3) The end of the policy period . . . .
>    15. Insured location means:
>       a. the residence premises;
>    17. Residence Premises means:
>       a. the one-family dwelling where you reside . . .
>       c. That part of any other building where you reside and which is shown as the residence premises in the Declarations;

(Doc. 33-4, Ex. C, Policy at DEF 28, 31) (bold type in original).

Marcano does not dispute that coverage under the Policy is conditioned upon the insured residing at the Property. Rather, plaintiff argues that the Policy itself reflects that the couple maintained two residences. (Doc. 38, Br. in Opp. at 8). Specifically, the renewal policy declarations for the periods spanning June 24, 2020 through June 24, 2021, and June 24, 2021 through June 24, 2022, identify the PA Property, as the "Residence Premises[.]" (Id. at DEF 4, 1464). The declarations further list the FL Property under "Additional Residences and Insured Locations[.]" (Id. at DEF 5, 1465).

Although the Policy does not define the term "reside," the Third Circuit Court of Appeals, applying Pennsylvania law, has defined the term as "to settle oneself or thing in a place; to be stationed; remain; stay." St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991); see Krager v. Foremost Ins. Co., 450 A.2d 736, 738 (Pa. Super. Ct. 1982) ("Residence [is defined as one's] factual place of abode"). Courts applying Pennsylvania law have consistently held that the term is unambiguous, even when left undefined in the policy itself. Gerow v. State Auto Prop. & Cas. Co., 346 F. Supp. 3d 769, 778–79 (W.D. Pa. 2018) (collecting cases).

At the same time, "[o]ccasional, sporadic, and temporary contacts are insufficient." Lewis, 935 F.2d 1432. Rather, residency requires "some measure of permanency or habitual repetition." Erie Ins. Exch. v. Weryha, 931 A.2d 739,

18

744 (Pa. Super. Ct. 2007).  Intention alone is not dispositive. Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 965 (Pa. Super. Ct. 2007).  In determining whether an individual "physically lives" at a particular location so as to reside there, courts must examine the totality of the circumstances and reach a common-sense conclusion. Id.  The insured bears the burden of establishing coverage under an insurance policy. Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1366-67 (Pa. 1987).

Pennsylvania courts have also recognized that an individual may reside in more than one location. In Amica Mut. Ins. Co. v. Donegal Mut. Ins. Co., the Pennsylvania Superior Court explained that dual residency may exist where an individual consistently divides time between multiple locations. 545 A.2d 343, 348 (Pa. Super. Ct. 1988) (citation omitted).  Moreover, "if there is more than one reasonable inference to make from the evidence regarding residency, the question of residency is a question of fact for the jury to decide." Allstate Ins. Co. v. Naskidashvili, No. CIV.A.07-4282, 2009 WL 399793, at *4 (E.D. Pa. Feb. 16, 2009); see Isenberg v. State Farm Fire & Cas. Co., 604 F. Supp. 3d 322, 329 (W.D. Pa. 2022) ("Because Pennsylvania law recognizes that Pennsylvania citizens may have more than one residence, and because, here, dual residency exists, the Court finds that Defendant's insurance policy provides coverage to the residence named on its declarations page – namely the Property.").

This case, like many residency disputes, presents competing factual narratives. See Menzies v. Auto-Owners Ins. Co., No. 2:23-CV-79-NR, 2024 WL 1677486, at *2 (W.D. Pa. Apr. 18, 2024) ("There is a genuine dispute of material fact about whether [plaintiff] resided in the property because the evidence submitted by the parties requires a factfinder to resolve the parties' differing views of the facts."). Although Marcano does not dispute that he and Decedent spent most, if not, all of their time in the FL Property during the relevant period, plaintiff contends that the couple nevertheless maintained two residences: the PA Property as their summer residence and the FL Property as their winter residence. (Doc. 33-4, Ex. M., Marcano Testimony at 36:2-25, 87:11-25).

According to Marcano, the couple intended to return to the PA property but were unable to travel from Florida to Pennsylvania due to Decedent's age, declining health, and the Covid-19 pandemic. (Id.) Plaintiff further asserts that the couple continued heat, electricity, and water service at the PA Property because they anticipated eventually returning there.[8] (Doc. 38, Br. in Opp. at 8-9).

---

[8] With respect to whether someone else had access to the PA Property, Crestbrook's expert, Stuart Morrison, P.E., noted in his report that Marcano stated no one besides him had keys to the home. (Doc. 39-2, Def. Ex. O, Morrison Report at 4). Morrison further noted that Guy Daro, plaintiff's friend who had been working around the PA Property, reportedly returned his key to plaintiff in December 2020. (Id.) Morrison therefore concluded that it was unknown who accessed the property around February 2021 to restore heat to the home. (Id.) Morrison also observed that gas bills reflected high usage in March and April 2021, but no significant usage

20

Marcano also points out that premiums continued to be paid on both properties and that the Policy itself identified the PA Property as the "Residence Premises" while listing the FL Property as an "Additional Residence . . . and Insured Locations [.]" (Id. at DEF 4, 5, 1464, 1465).

Although intention is not a relevant consideration, the evidence nonetheless creates a genuine dispute of material fact as to whether the couple maintained dual residency. At this juncture, it is not the role of the court at summary judgment to weigh the evidence or make credibility determinations. If a

_____

afterward, suggesting that someone may have turned the heat off. (Id.)  At most, this evidence creates a genuine dispute of material fact for the jury.

The parties also dispute whether heat was being maintained at the PA Property at the time of the pipe burst. Marcano's expert, Joseph D. Hudak, P.E., noted in his report that Marcano stated that electricity and gas service to the house remained on between December 2020 and March 2021. (Doc. 37-6, Pl. Ex. F, Hudak Report at 3).  Hudak further opined that, at the time of the pipe burst, it would be reasonable to conclude that there had been a power outage or that the electrical service had been disconnected by PPLC Electric Utilities. (Id.)

Crestbrook's expert, Morrison, P.E., reached a different conclusion. Morrison agreed with Hudak's assessment "that the loss occurred between January 25 and February 2, [2021] based upon the water usage records." (Doc. 39-2, Def. Ex. O, Morrison Report at 4). Nonetheless, Morrison noted that utility and fuel records showed little gas usage during November 2020, December 2020, or January 2021, and only moderate usage in February 2021. (Id. at 1).  According to Morrison, the lack of gas usage suggested that the boilers were not operating and that the heat was not being maintained during that period. (Id.)  Morrison further stated that gas usage from November 2020 through February of 2021 was roughly consistent with normal summer usage, indicating that only the boiler pilots were likely consuming gas. (Id. at 4).  Morrison ultimately concluded that there was no indication that the gas had been shut off, but also no indication that the boilers were actively heating the home before the February gas bill. (Id.)  In Morrison's view, this suggested that heat was not being maintained at the PA Property at the time of loss or damage. (Id.)

Accordingly, whether heat was being maintained at the PA Property remains a disputed issue of fact for the jury to decide.

21

reasonable juror could review the record and conclude that the couple maintained dual residency, summary judgment is inappropriate. Accordingly, whether the couple resided at the PA Property at the time of the pipe burst is an issue for the jury to resolve at trial. [9]

### c. Continuous or Repeated Seepage or Leakage

Next, Crestbrook argues that plaintiff's claim is excluded under the Policy's exclusion for continuous or repeated seepage or leakage of water occurring over a period of weeks, months, or years from a plumbing system. (Doc. 39, Reply Br. at 8-9).

The Policy provides, in relevant part:

> 1. Unless noted otherwise, we do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event

---

[9] The court finds support for its decision in several cases addressing residency determinations under insurance policies. See, e.g., Hudspeth v. Nationwide Prop. & Cas. Ins. Co., No. CV 24-169, 2025 WL 2097606, at *3 (W.D. Pa. July 25, 2025) (denying summary judgment on breach of contract claim where, despite extended hospital and nursing facility stays following a fall, the plaintiff-insured continued paying utilities for her longtime home and arranged for its regular upkeep); Isenberg, 604 F. Supp. 3d at 329 (denying the insurer's motion for summary judgment where the plaintiff temporarily rented an apartment while extensively renovating the insured property, supporting a finding that she continued to reside there); Naskidashvili, 2009 WL 399793, at *4 (denying summary judgment motion where competing evidence created a genuine issue of material fact as to whether an individual was a resident of the insured household); Strouss v. Fireman's Fund Ins. Co., No. CIV.A. 03-5718, 2005 WL 418036, at *11–12 (E.D. Pa. Feb. 22, 2005) (finding the record insufficient to determine as a matter of law whether a college student resided in his parents' household and proceeding to bench trial on the residency issue); Kaylor v. Donegal Mut. Ins. Co., No. 1068 WDA 2012, 2013 WL 11272836, at *3 (Pa. Super. Ct. Mar. 19, 2013) (holding that an insured remained a resident of the household for UIM coverage purposes despite temporarily residing in a personal care home while recovering from surgery, where she continued receiving mail, kept her belongings and pets, and maintained that permanent home as her residence).

contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area

. . . .

t. Continuous or repeated seepage or leakage of water or steam over a period of weeks, months or years from a:

(1) Heating, air conditioning or automatic protective sprinkler system;
(2) Household appliance;
(3) Plumbing system; or
(4) Water, steam or sewer pipes, or storm drains located off the **residence premises**.
A plumbing system or household appliance does not include a sump pump, sump pump well or other system designed to remove subsurface water drained from the **foundation** area. However, any ensuing loss to property described in Coverage A, B and C not precluded by any other provision in this policy is covered. In addition, if loss caused by water or steam is not otherwise excluded, **we** will cover the cost of tearing out and replacing any part of the building necessary to repair or replace the system or appliance. **We** do not cover loss to the system or appliance from which the water or steam escaped.

(Doc. 33-4, Ex. C, Policy at DEF 38, 40-41) (bold type in original).

Crestbrook contends that the water usage data and expert opinions conclusively establish that water leaked throughout the PA Property for weeks or months before plaintiff discovered the damage. According to defendant, hundreds of thousands of gallons of water leaked between January and April 2021, thereby triggering the exclusion. (Doc. 33-1, Br. in Supp. at 13).

23

Marcano disputes that characterization. According to plaintiff, the exclusion does not apply because the damage was not caused by a slow or gradual water trickle, but rather by a sudden pipe burst that caused a substantial flood throughout the home.[10] (Doc. 38, Br. in Opp. at 9).

Plaintiff's expert, Joseph Hudak, P.E., opined that "the damage to the pipes and valve is because of pipes that froze causing the pipes and val[v]e to burst, thus releasing substantial water." (Doc. 37-6, Ex. F, Hudak Report at 3). Likewise, Marcano's other expert, Shane Elllis, P.A., noted that "the loss was caused by a valve rupture and bathroom pipes rupture and, after close inspection, both failures were from freezing expansion . . . The fractures caused water to burst out and flood the 2nd floor, 1st floor and basement." (Doc. 37-4, Ex. D., Ellis Report at 1).

Plaintiff cursorily suggests that the exclusion is ambiguous, although he does not identify any specific term within the exclusion that is susceptible to multiple reasonable interpretations. (Doc. 38, Br. in Opp. at 9). Alternatively, Marcano argues that the evidence creates a genuine dispute of material fact as to whether the damage resulted from gradual seepage or leakage, as opposed to

---

[10] Plaintiff argues that Crestbrook bears the burden of proof with respect to the applicability of the "seepage or leakage" exception. (Doc. 38, Br. in opp. at 9). The court disagrees. Under Pennsylvania law, the insured bears the burden of establishing coverage under an insurance policy. See Erie Ins. Exchange, 533 A.2d at 1366–67.

24

a sudden flood or caused by a pipe burst. (Id.)  The court finds Marcano's first argument unpersuasive but agrees that a genuine dispute of material fact exists as to the second issue.

Under Pennsylvania law, when "the language of the contract is clear and unambiguous, a court is required to give effect to that language." Liberty Mut. Ins. Co. v. Sweeney, 689 F.3d 288, 293 (3d Cir. 2012) (quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)).  Conversely, ambiguous policy provisions are generally construed in favor of the insured. Gardner v. State Farm Fire & Cas. Co., 544 F.3d 553, 558 (3d Cir. 2008).  A provision is ambiguous only if it is reasonably susceptible to more than one interpretation.[11] Id. (citations and internal quotation marks omitted).

The court agrees with Crestbrook that the "continuous or repeated seepage or leakage" language is not ambiguous.  For instance, at least one sister court concluded that the policy's failure to define the phrase "continuous or repeated seepage or leakage" which "occurs over a period of time" does not render the provision ambiguous. Brodzinski v. State Farm Fire & Cas. Co., No. CV 16-6125, 2017 WL 3675399, at *5 (E.D. Pa. Aug. 25, 2017); see Fifth v. State Farm Ins. Co., No. 11-7440, 2014 WL 1253542, at *5 (D.N.J. Mar. 25, 2014) (finding

---

[11] If possible, courts must interpret an insurance policy in a manner that avoids ambiguity and gives effect to all of its provisions. Am. Auto. Ins. Co. v. Murray, 658 F.3d 311, 321 (3d Cir. 2011).

25

exclusion for "continuous or repeated seepage or leakage of water . . . which occurs over a period of time" to be unambiguous and concluding that leakage occurring over the course of one month fell within the exclusion); see also Simon Wrecking Co. v. AIU Ins. Co., 350 F. Supp. 2d 624, 636 (E.D. Pa. 2004) ("The mere fact that a term used in the policy is not defined does not make the policy ambiguous."). Rather, "[w]here critical terms are left undefined in a policy, Pennsylvania case law instructs that 'words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense . . . and we may inform our understanding of these terms by considering their dictionary definitions.' " Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 435–36 (3d Cir. 2006) (quoting Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 108 (Pa. 1999)).

Courts interpreting similar language have concluded that the exclusion applies to damage caused by ongoing or repeated leakage over time, as opposed to damage caused by a single, abrupt event. See Brodzinski, 2017 WL 3675399, at *5 ("There is nothing that is ambiguous about the phrase 'over a period of time' when read in the context of the entire exclusion.") (citing Fifth v. State Farm Ins. Co., 2014 WL 1253542, at *5)).

In Brodzinski, the plaintiff sought coverage for water damage allegedly caused by a leaking air-conditioning unit. Id. at 1. Although the court granted

26

summary judgment on the plaintiff's bad faith claim, it observed that the competing expert opinions created a factual dispute as to whether the damage resulted from repeated seepage over time or from a "one time occurrence[.]" Id. at 6. The court therefore recognized that such a dispute could present a triable issue regarding coverage under the policy.[12]

Although the exclusion itself is unambiguous, the evidence here creates a factual dispute as to whether the damage resulted from a gradual leakage "over a period of weeks, months or years" or from a sudden pipe burst caused by freezing conditions. Marcano's experts characterize the event as a sudden rupture that caused flooding throughout the home, while defendant's evidence suggests prolonged leakage over an extended period. See Laszlo v. State Farm Fire & Cas. Co., No. 23CV21529 (EP) (JRA), 2025 WL 2611317, at *12 (D.N.J. Sept. 10, 2025) ("Because [plaintiffs] have presented admissible expert testimony to dispute whether the break [in the PVC pipe] occurred abruptly or not, State Farm's responsibility under the Policy is still up for debate."); see also Brodzinski, 2017 WL 3675399, at *6. Those disputes of material fact as to coverage under the Policy preclude summary judgment on this basis.

---

[12] Defendant in Brodzinski moved for summary judgment only as to the plaintiff's bad faith claim, not the breach of contract claim. 2017 WL 3675399, at *1.

27

In sum, Crestbrook's motion for summary judgment will be denied with respect to Marcano's breach of contract claim.

## 2. Bad Faith

Defendant also contends that plaintiff cannot meet his burden of proving bad faith by clear and convincing evidence. (Doc. 33, ¶ 48). According to defendant, the record establishes that it had a reasonable basis for denying plaintiff's claim.

Under Pennsylvania law, bad faith includes "any frivolous or unfounded refusal to pay proceeds of a policy[.]" Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)). Bad faith imports "a dishonest purpose" or a breach of a known duty through "some motive of self-interest or ill will [.]" Keefe v. Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000) (quoting Terletsky, 649 A.2d at 688)). Mere negligence or bad judgment does not constitute bad faith. Id.

To prevail on a statutory bad faith claim under 42 PA. CONS. STAT. § 8371, a plaintiff must prove by clear and convincing evidence that the insurer: (1) lacked reasonable basis for denying benefits under the policy; and (2) knew of or

recklessly disregarded its lack of a reasonable basis.[13] Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005); W.V. Realty, Inc. v. N. Ins. Co., 334 F.3d 306, 312 (3d Cir. 2003) (citing Keefe, 203 F.3d at 225)).  The clear and convincing standard requires evidence that is so "clear, direct, weighty and convincing" as to permit a clear conviction, without hesitation, that the insurer acted in bad faith. Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 752 (3d Cir. 1994) (citations omitted); Terletsky, 649 A.2d at 688 (finding that bad faith must be proven and "not merely insinuated."); see also J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004) ("Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial.") (citation omitted)).

Upon review of the record, the court concludes that Marcano has failed to produce clear and convincing evidence that Crestbrook acted in bad faith. Specifically, plaintiff has not shown that Crestbrook lacked a reasonable basis for its handling of the claim or knowingly or recklessly disregarded the absence of such a basis.

The record reflects that Marcano discovered the water damage in June 2022.  Shortly after receiving notice of the claim, Crestbrook issued Marcano a

---

[13] Under Pennsylvania's bad faith statute, courts may award interest, punitive damages, costs and attorneys' fees, in actions arising under an insurance policy, if it is determined that the insurer has acted in bad faith towards the insured. 42 PA. CONS. STAT. § 8371.

reservation of rights letter dated June 14, 2022, identifying potential coverage issues, reserving its rights under the Policy, and advising plaintiff of the Policy provision requiring suit to be filed within two years of the date of loss or damage. (Doc. 33-4, Ex. L, Reservation Letter at DEF 327-31).

Crestbrook then conducted an extensive investigation.  On June 20, 2022, defendant retained professional engineer Rober Monaco, who inspected the PA Property in the presence of Marcano and a representative from defendant's Special Investigation Unit. (Doc. 33-4, Ex. J, Engineering Report at DEF 79). Monaco concluded that the significant increase in water usage in February and March 2021 indicated "a severe water supply line leak". (Id. at DEF 80).

On July 19, 2022, Crestbrook retained GEM to inspect the PA Property. (Doc. 33-4, Ex. K, Gallinger Report at DEF118).  GEM observed extensive mold growth and water damage throughout the house and concluded that the damage was not recent. (Id.)  GEM further determined that the primary source of the water damage was plumbing leaks originating primarily from the second floor bathroom area and concluded, based on the water bills, that the plumbing failure occurred in February 2021. (Id. at DEF 119).

A month later, Crestbrook retained another professional engineer, Stuart Morrison, P.E., to inspect the PA Property. (Doc. 33-4, Ex. F., Cause of Loss Report at DEF 96).  Morrison concluded that the damage was caused primarily

30

by a failed water valve serving the second-floor bathroom, as well as an additional waterflow from radiators on the second floor. (Id. at DEF 95). He further noted that the mold growth resulted from the failure to timely mitigate the water damage. (Id.)

In a supplemental report dated December 9, 2022, Morrison opined that the failed quarter-turn ball valve caused the damage throughout the PA Property and that the water utility records showed water flowing for approximately twenty-five days before the February meter reading. (Doc. 33-4, Ex. H, Supplemental Report at ECF p. 171-72). Based on these records, Morrison concluded that the loss likely began around January 30, 2021, rather than two days before the February 23, 2021 meter reading. (Id.)

The record therefore demonstrates that Crestbrook conducted a thorough investigation before denying plaintiff's claim. See Condio v. Erie Ins. Exch., 899 A.2d 1136, 1142 (Pa. Super. Ct. 2006) ("Bad faith conduct also includes lack of good faith investigation into facts." (citation omitted)). There is likewise no evidence that Crestbrook's denial was frivolous, unfounded, or motivated by self-interest or ill will. Terletsky, 649 A.2d at 688 (citation omitted). Rather, the evidence reflects that Crestbrook relied on inspections, expert evaluations, water usage records, and the Policy language in reaching its coverage determination.

31

Crestbrook also provided Marcano with a written denial letter explaining the factual basis for the denial and identifying the specific Policy provisions upon which it relied.

Plaintiff further contends that Crestbrook acted in bad faith because both the PA Property and the FL Property were covered under the Policy and because defendant failed to adequately consider the travel limitations created by Decedent's age, health, and the Covid-19 pandemic. (Doc. 38, Br. in Opp. at 10). These arguments, however, fall short.

Although plaintiff's expert disputes some of the defendant's experts' conclusions—particularly regarding whether the damage resulted from a sudden pipe burst or prolonged leakage—that disagreement creates a factual dispute regarding coverage, not bad faith.  At most, the parties disagree as to the proper interpretation and application of the Policy provisions.  But "mere negligence" or "bad judgment" is insufficient to establish bad faith. Terletsky, 649 A.2d at 688 (citation omitted); see also Bostick v. ITT Hartford Grp., Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) ("Bad faith cannot be found where the insurer's conduct is in accordance with a reasonable but incorrect interpretation of the insurance policy and the law.") (citation omitted).

Plaintiff has failed to present clear and convincing evidence that Crestbrook acted unreasonably or knowingly disregarded a lack of reasonable basis for

32

denying the claim.  Given the record and the heightened clear and convincing evidentiary burden applicable to statutory bad faith claims, no reasonable jury could conclude that Crestbrook lacked a reasonable basis for its assessment and denial of plaintiff's claim, or that Crestbrook knowingly or recklessly disregarded the absence of such a basis.   Accordingly, plaintiff's bad faith claim cannot survive summary judgment.

**Conclusion**

Crestbrook's motion for summary judgment will be granted in part and denied in part. (Doc. 33).  The motion will be granted as to plaintiff's bad faith claim and denied as to the breach of contract claim.  An appropriate order follows.  This matter will be scheduled for a pretrial conference by way of a separate order.

Date: 6/4/26

JUDGE JULIA K. MUNLEY
United States District Court

33